**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| WENDY DAVIS; MARVA SADLER; SEAN MEHL; and STIGMA RELIEF FUND, | ) ) ) | CIVIL ACTION |
| *Plaintiffs*, | ) ) | CASE NO.   22-cv-373 |
| v. | ) ) | |
| MISTIE SHARP; SADIE WELDON; ASHLEY MAXWELL; and BRISCOE ROWELL CAIN III, | ) ) ) ) | |
| *Defendants*. | | |

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants and in support thereof allege the following:

### INTRODUCTION

1.      Abortion funds are charitable organizations that provide financial assistance to abortion patients. Plaintiffs are an abortion fund that serves Texas abortion patients and three individuals who wish to donate money to abortion funds that serve Texas abortion patients, including two who currently serve on the Board of Directors of the Plaintiff abortion fund.   They bring this lawsuit under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 to seek a declaration that the following laws are unenforceable because they violate the U.S. Constitution: Texas Senate Bill 8, 87th Leg., Reg. Sess. (Tex. 2021) ("S.B. 8"), and Texas Penal Code arts. 1191-94, 1196 (1972) (the "Criminal Abortion Ban"), which the U.S. Supreme Court held unconstitutional in *Roe v. Wade*, 410 U.S. 113, 164–67 (1973). A copy of S.B. 8 is attached as Exhibit 1, and the text of the Criminal Abortion Ban is set forth in *Roe*.  *See* 410 U.S. at 117 n.1.[1]

---

[1] The Criminal Abortion Ban was also codified at Tex. Civil Stat. arts. 4512.1-4512.4, 4512.6 (1974).

2.      S.B. 8 is a blatantly unconstitutional law that bans abortion beginning at approximately six weeks of pregnancy, as measured from the first day of a patient's last menstrual period ("LMP"), and incentivizes vigilante harassment of anyone who assists abortion patients. Since it took effect on September 1, 2021, S.B. 8 has dramatically reduced abortion access in Texas.  This has had an immediate and devasting impact on all Texans seeking abortion care, which is felt most acutely by the marginalized communities that abortion funds serve. Many of these Texans do not know that they are pregnant before six weeks LMP or cannot marshal the resources needed to obtain abortion care before six weeks LMP.  Those who are able to travel out of state for abortion care do so at the expense of their well-being, dignity, financial resources, and job and care-taking responsibilities.  Those unable to leave Texas are forced to suffer the life-altering physical, emotional, and economic consequences of unwanted pregnancy and childbirth.

3.      Ironically, by banning abortions at six weeks of pregnancy, S.B. 8 has led to a significant increase in second-trimester abortions.  Many Texans who are just beyond the statute's gestational limit are delayed by the need to gather the resources and make the arrangements required for out-of-state travel.  Exacerbating the problem, the cost of abortion care increases with gestational age, which often compounds delay.  The longer someone is delayed, the more money they must raise to pay for the procedure, which traps patients with limited financial means in a terrible cycle.  In addition, abortion providers in states neighboring Texas lack the capacity to meet the increased demand for their services.  Consequently, Texas patients must compete with patients living in those states for a limited number of appointments, leading many Texans to seek abortion care in states that are farther away.  The result is cascading delays in abortion access across the country, with some Texas patients traveling hundreds or even thousands of miles to reach an available abortion provider.

4.      S.B. 8 prohibits government officials from directly enforcing its provisions. Instead, it deputizes private citizens to enforce the statute, allowing "any person" other than a government official to bring a civil lawsuit against anyone who provides an abortion in violation of the statute, "aids or abets" such an abortion, or intends to do so. S.B. 8 § 3 (codified at Tex. Health & Safety Code § 171.208) (hereinafter S.B. 8 citations are to newly created sections of Tex. Health & Safety Code only).  The only conduct that S.B. 8 explicitly identifies as aiding or abetting is "paying for or reimbursing the costs of an abortion."  Tex. Health & Safety Code § 171.208(a)(2).  S.B. 8 authorizes private suits regardless of whether the person suing has any connection to the abortion or person sued.  If a claimant in an S.B. 8 case prevails, they are entitled to (1) "injunctive relief sufficient to prevent" future violations; (2) "statutory damages" of *at least* $10,000 per abortion, with no apparent maximum amount; and (3) costs and attorney's fees. *Id.* § 171.208(b).  In effect, S.B. 8 places a bounty on people who facilitate abortion access, inviting random strangers to sue them.

5.      Texas has admitted that the goal of S.B. 8's enforcement scheme is to prevent federal courts from holding the State accountable for the statute's blatantly unconstitutional provisions.[2]  As the legislative director for Texas Right to Life (the largest anti-abortion organization in the State) explained during the legislative proceedings, every six-week ban on abortion adopted by other states "has been enjoined or had at least some negative court action," and "it's because of the [government] enforcement mechanism[]" provided for in those laws.[3]  He

---

[2] Video of Oral Arg. at 17:48-18:07, *Whole Woman's Health v. Jackson*, 65 Tex. Sup. Ct. J. 625 (Mar. 14, 2022) (Cause No. 22-0033), https://www.texasbarcle.com/cle/SCPlayer5.asp?sCaseNo=22-0033&bLive=&k=&T=17.

[3] *Hr'g on S.B. 8 Before the S. Comm. on State Affairs*, 87th Leg., Reg. Sess. 7:30-7:45 (Tex. 2021) (statement of John Seago, Leg. Dir. of Tex. Right to Life), https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15469.

later added that some abortion opponents thought that the approach taken by other states "was not working in federal court, so let's try a different route."[4]

6.      Thus, S.B. 8 seeks not only to strip Texans of their fundamental right to make decisions about their pregnancies based on their individual circumstances and religious beliefs, but also to make a mockery of the federal courts.  This is the case even though—or perhaps because—the law has long recognized that federal courts play a crucial role in "vindicat[ing] federal rights and hold[ing] state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)).  Indeed, more than a century of precedent "has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely as a shield, for those whom they were designed to protect."  *Edelman v. Jordan*, 415 U.S. 651, 664 (1974).  Those Civil War Amendments led to the enactment of 42 U.S.C. § 1983, which authorizes this lawsuit.

7.      Plaintiffs bring this lawsuit against Defendant Mistie Sharp because she has sworn under penalty of perjury that she intends to sue abortion funds that pay for abortions in violation of S.B. 8.  Likewise, Plaintiffs bring this suit against Defendants Sadie Weldon and Ashley Maxwell because they have initiated proceedings to sue certain Texas abortion funds and their donors, employees, and volunteers under S.B. 8, and publicly threatened all Texas abortion funds and their associates with civil lawsuits under S.B. 8. Plaintiffs bring this lawsuit against Defendant Briscoe Rowell Cain III, a member of the Texas House of Representatives, because he sent cease-and-desist letters to Texas abortion funds and made public statements asserting that Texas abortion

---

[4] Sabrina Tavernise, *Citizens, Not the State, Will Enforce New Abortion Law in Texas*, N.Y. Times (July 9, 2021), https://www.nytimes.com/2021/07/09/us/abortion-law-regulations-texas.html.

funds and their donors, employees, and volunteers are subject to prosecution under the Criminal Abortion Ban.

8.      At core, the question in this case is whether Texas may adopt a law that sets about to "do precisely that which the [Constitution] forbids." *Terry v. Adams*, 345 U.S. 461, 469–70 (1953) (holding that a political association's exclusion of Black voters from political primaries was unconstitutional state action designed to insulate primaries from federal court review).  The answer to that question must be no.  Otherwise, states and localities across the country would have free rein to target the exercise of federal rights they disfavor for ruinous civil liability.

9.      Plaintiffs urgently need this Court to stop Texas's brazen defiance of the rule of law, uphold the federal constitutional rights of pregnant Texans, and restore the ability of abortion funds and their associates to fully serve Texas abortion patients.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.  This is a civil rights action arising under 42 U.S.C. § 1983 and the U.S. Constitution.

11.     Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201-2202, Rule 57 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of the Court, including the Court's inherent authority to enforce the supremacy of federal law as against contrary state law.

12.     Venue is appropriate in this district under 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. *See Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 492–94 (5th Cir. 2018) (discussing the requirements for venue under 28 U.S.C. § 1391(b)). Plaintiff Stigma Relief Fund serves clients who reside and/or seek abortion care in this district.  The individual Plaintiffs seek to continue donating money to Stigma Relief Fund and other abortion funds that serve clients who reside

and/or seek abortion care in this district. Ms. Sadler and Mr. Mehl also serve on the Board of Directors of Stigma Relief Fund. In addition, Defendant Sharp has intervened in a lawsuit pending in this district based on her declared intention to sue Texas abortion funds under S.B. 8. Defendant Weldon has taken steps to enforce S.B. 8 against an abortion fund based in this district. Likewise, Defendant Cain sent cease-and-desist letters to Texas abortion funds using his official letterhead, and he maintains an office in this district. Additionally, S.B. 8 was enacted in this district, which includes the State capitol.

13.     This case is related to two open cases in this district that are assigned to the Honorable Robert Pitman: *Whole Woman's Health v. Jackson*, No. 1:21-CV-616-RP and *United States v. Texas*, No. 1:21-CV-796-RP.  Both cases involve challenges to the constitutionality of S.B. 8.  Marva Sadler is also a plaintiff in *Whole Woman's Health v. Jackson*.

## PLAINTIFFS

14.     Plaintiff Wendy Davis is a Texas resident who strongly supports abortion rights. She currently donates money to the abortion fund targeted by Defendant Weldon, and she works in coalition with that abortion fund and others to support abortion patients and advocate for abortion rights.  Defendants' public threats against abortion funds and their associates have had a chilling effect on some of those organizations and individuals, including the other Plaintiffs, which intrudes upon Ms. Davis' ability to associate with like-minded people to express her views and achieve her advocacy goals.

15.     Plaintiff Marva Sadler is a Texas resident who has worked in Texas abortion clinics for over fifteen years. She currently serves as the Chair of the Stigma Relief Fund's Board of Directors, and she regularly donates money to that organization.  Ms. Sadler sometimes donates money to other Texas abortion funds, as well. She is aware of Defendants' threats concerning enforcement of S.B. 8 and the Criminal Abortion Ban against Texas abortion funds and their

donors, employees, and volunteers. Because of those threats, she intends to forgo making additional donations to Texas abortion funds until the Court clarifies whether and to what extent she can face liability for doing so.

16.    Plaintiff Sean Mehl is a Virginia resident and has worked in abortion clinics for nearly a decade. He currently serves on Stigma Relief Fund's Board of Directors, and he regularly donates money to that organization.  Mr. Mehl sometimes donates money to other Texas abortion funds as well. He is aware of Defendants' threats concerning enforcement of S.B. 8 and the Criminal Abortion Ban against Texas abortion funds and their donors, employees, and volunteers. Because of those threats, he intends to forgo making additional donations to Texas abortion funds until the Court clarifies whether and to what extent he can face liability for doing so.

17.    Plaintiff Stigma Relief Fund is a nonprofit organization incorporated under the laws of Texas.  The mission of Stigma Relief Fund is to ensure that everyone who needs an abortion receives the compassionate, high-quality abortion care they deserve. To that end, Stigma Relief Fund provides financial and practical support to abortion patients seeking care at allied clinics, including clinics in Texas. Many patients who seek help from the Stigma Relief Fund are past six weeks LMP. Given Defendants' threats concerning enforcement of S.B. 8 and the Criminal Abortion Ban against Texas abortion funds and their associates, the Stigma Relief Fund has ceased providing financial assistance to Texas patients beyond six weeks LMP unless they travel out of state to obtain abortion care.  Further, the Stigma Relief Fund is concerned that Defendants' threats will have a chilling effect on its donors, prospective employees, and volunteers.

## DEFENDANTS

18.    Defendant Mistie Sharp is a Texas resident. S.B. 8 deputizes her to enforce the statute, and she has sworn under penalty of perjury that she intends to sue abortion funds that pay for abortions in violation of S.B. 8.

19.     Defendant Sadie Weldon is a Texas resident. S.B. 8 deputizes her to enforce the statute.  She has commenced legal proceedings against at least one Texas abortion fund and publicly threatened all Texas abortion funds and their associates with civil lawsuits under S.B. 8.

20.     Defendant Ashley Maxwell is a Texas resident. S.B. 8 deputizes her to enforce the statute. She has commenced legal proceedings against at least one Texas abortion fund and publicly threatened all Texas abortion funds and their associates with civil lawsuits under S.B. 8.

21.     Defendant Briscoe Rowell Cain III is the Texas State Representative of House District 128. He sent cease-and-desist letters on his official letterhead to Texas abortion funds and made public statements asserting that all Texas abortion funds and their associates are subject to prosecution under the Criminal Abortion Ban.

## FACTUAL ALLEGATIONS

## I.     ABORTION IN THE UNITED STATES

22.     Legal abortion is one of the safest medical interventions performed in the United States.  In recent years, the abortion-related mortality rate has been 0.44 abortion-related deaths per 100,000 abortions.[5]  Abortion-related mortality is lower than that for colonoscopies, plastic surgery, dental procedures, and adult tonsillectomies.[6]

23.     Notably, abortion entails significantly less medical risk than carrying a pregnancy to term and giving birth.  Maternal mortality is a serious problem in the United States.  We have the highest maternal mortality rate among developed countries, and it has increased during the

---

[5] Katherine Kortsmit et al., *Abortion Surveillance—United States, 2018*, MMWR Surveillance Summaries, Nov. 27, 2020, at 7, https://www.cdc.gov/mmwr/volumes/69/ss/pdfs/ss6907a1-H.pdf.

[6] Nat'l Acads. of Scis., Eng'g, & Med., *The Safety and Quality of Abortion Care in the United States* 74-75 (2018), https://doi.org/10.17226/24950 ("NASEM Report").

COVID-19 pandemic.[7]  Pregnancy-related deaths disparately impact communities of color:  Black and Indigenous people die from pregnancy-related causes at a much higher rate than white people.[8]

21.     Overall, the risk of death from carrying a pregnancy to term is approximately fourteen times higher than that from having an abortion, and every pregnancy-related complication is more common among people giving birth than among those having abortions.[9]  Additionally, although abortion is safe throughout pregnancy, the risk, complexity, and duration of abortion care increase with gestational age.[10]  Thus, delaying or preventing people from accessing wanted abortion care increases their risks of complication and death.

22.     In addition to being safe, abortion is also common: approximately one in four women[11] in the United States will have an abortion by age forty-five.[12]

23.     People seek abortions for a variety of deeply personal reasons, including familial, medical, and financial ones.  Deciding whether to end a pregnancy or give birth implicates a

---

[7] Roni Caryn Rabin, *Maternal Deaths Rose During the First Year of the Pandemic*, N.Y. Times (Feb. 23, 2022),  https://www.nytimes.com/2022/02/23/health/maternal-deaths-pandemic.html?smid=url-share.

[8] *Id.*

[9] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216-17 (2012).

[10] NASEM Report, *supra* note 6, at 10.

[11] Although most people with the capacity to become pregnant are women, some transgender men and nonbinary people also have the capacity to become pregnant. *See, e.g.*, Heidi Moseson et al., *Development of an affirming and customizable electronic survey of sexual and reproductive health experiences for transgender and gender nonbinary people*, PLoS ONE, May 4, 2020, at 2-3, https://doi.org/10.1371/journal.pone.0232154;Juno Obedin-Maliver & Harvey J. Makadon, *Transgender men and pregnancy*, 9 Obstetric Med. 4, 4–6 (2016).  The language used in the scientific literature and caselaw does not always reflect this reality.  *See, e.g.*, *Reprod. Health Servs. v. Strange*, No. 17-13561, 2021 WL 2678574, at *1 n.2 (11th Cir. June 30, 2021) ("Although this opinion uses gendered terms, we recognize that not all persons who may become pregnant identify as female.").  Nevertheless, the Constitution protects the fundamental right of all pregnant people, regardless of gender identity, to access pre-viability abortion care.

[12] Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008-2014*, 107 Am. J. Pub. Health 1904, 1907-08 (2017).

person's core religious beliefs, values, and family circumstances.  Some people have abortions because it is not the right time to have a child or add to their families.  Others want to pursue educational or professional goals; lack the economic resources needed to raise children; lack support from their partners or have abusive partners; have medical conditions that heighten the risks of pregnancy or receive a diagnosis of fetal anomaly; are pregnant as a result of rape or incest; or simply do not want to have children.  Many people have multiple, intersecting reasons for deciding to have an abortion.

24.     Nearly 60% of abortion patients in the United States have already had a child.[13]

25.     Most abortion patients have religious affiliations.  Nationwide, 24% are Roman Catholics; 17% are mainline Protestants; 13% are evangelical Protestants; and 8% belong to other faith traditions.[14]

26.     Three-quarters of U.S. abortion patients have low incomes, with nearly half living below the federal poverty level.[15]

## II.     S.B. 8'S STATUTORY FRAMEWORK

27.     As enacted, S.B. 8 has ten sections.  Its operative provisions are set forth in Sections 3 and 4, which include an abortion ban, civil enforcement mechanism, and fee-shifting scheme. These provisions are described in detail below.

---

[13] Kortsmit et al., *supra* note 5, at 6.

[14] Jenna Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* 7 (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[15] *Id.*

A.      **Section 3 of S.B. 8: The Six-Week Ban and Civil Enforcement Mechanism**

(i)      *The Abortion Ban*

28.      Section 3 of S.B. 8 requires physicians who perform abortions in Texas to first determine whether "a detectable fetal heartbeat" is present.   Tex. Health & Safety Code § 171.203(b); *see id.* § 171.201(1). It prohibits the physician from providing an abortion after "detect[ing] a fetal heartbeat" or if the physician "failed to perform a test to detect a fetal heartbeat."  *Id.* § 171.204(a).  S.B. 8 contains no exception for pregnancies that result from rape or incest, or for fetal health conditions that are incompatible with sustained life after birth.  The only exception is for a medical emergency.  *Id.* §§ 171.204(a), 171.205(a).  Sections 7 and 9 of S.B. 8 impose additional reporting requirements on abortions performed because of a medical emergency.  *Id.* §§ 171.008, 245.011(c).

29.      S.B. 8 defines "fetal heartbeat" as "cardiac activity or the steady and repetitive rhythmic contraction of the fetal heart within the gestational sac." *Id.* § 171.201(1).  In a typically developing pregnancy, ultrasound can generally detect cardiac activity beginning at approximately six weeks LMP.

30.      S.B. 8 thus prohibits virtually all abortions after approximately six weeks LMP—before many patients even know they are pregnant.  Indeed, for patients with regular menstrual periods, six weeks of pregnancy is only two weeks after the patient's first missed period.

31.      A full-term pregnancy is approximately 40 weeks LMP.

32.      The cells that produce the early cardiac activity described in S.B. 8 have not yet formed a "heart."  The term "heartbeat" in S.B. 8 thus covers not just a "heartbeat" in the lay sense, but also early cardiac activity—more accurately, electrical impulses—present before full development of the cardiovascular system.  Similarly, a developing pregnancy is properly referred to as an "embryo" until approximately ten weeks LMP, when it becomes a "fetus."  So, despite

S.B. 8's use of the phrase "fetal heartbeat," the law forbids abortion even when cardiac activity is detected in an embryo. *See id.* §§ 171.201(1), 171.201(7), 171.204(a). Because neither "fetal" nor "heartbeat" is accurate medical terminology at this stage of pregnancy, Plaintiffs refer to the prohibition against providing an abortion after the detection of a "fetal heartbeat" as a "six-week ban."

33.     No embryo is viable at six weeks LMP, or at any other point when cardiac activity can first be detected by ultrasound. Instead, viability is generally understood as the point in pregnancy when a fetus, if born at that time, would have a reasonable likelihood of sustained life after birth, with or without artificial support.

34.     Viability typically occurs around twenty-four weeks LMP. By prohibiting abortion after approximately six weeks LMP, S.B. 8 bans abortion months before viability is possible.

> **(ii)     *Civil Liability for Providing Prohibited Abortions and Aiding or Abetting Prohibited Abortions***

35.     S.B. 8 creates civil liability for "perform[ing] or induc[ing] an abortion in violation of" the six-week ban. *Id.* § 171.208(a)(1).

36.     S.B. 8 also creates civil liability for "knowingly engag[ing] in conduct that aids or abets the performance or inducement of" an abortion that violates the six-week ban. *Id.* § 171.208(a)(2). Although S.B. 8 does not define aiding or abetting, it expressly prohibits "paying for or reimbursing the costs of an abortion." *Id.* Further, S.B. 8 makes someone liable for aiding or abetting a prohibited abortion "regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of" S.B. 8. *Id.*

37.     Finally, S.B. 8 creates civil liability for anyone who "intends to" perform, induce, aid, or abet a prohibited abortion, regardless of whether they actually commit those acts. *Id.* § 171.208(a)(3).

### (iii) *Enforcement Actions and Penalties for Non-Compliance*

38.     S.B. 8 expressly precludes government officers from directly enforcing the six-week ban.  *Id.* § 171.207(a).  Instead, the statute creates a private, civil enforcement mechanism: "Any person, other than an officer or employee of a state or local governmental entity in this state, may bring a civil action against any person" who performs a prohibited abortion, aids or abets a prohibited abortion, or intends to engage in these activities.  *Id.* § 171.208(a)(1)-(3).

39.     Besides government officers, the only people barred from initiating an S.B. 8 enforcement action are those "who impregnated the abortion patient through an act of rape, sexual assault, incest," or certain other crimes.  *Id.* § 171.208(j).  However, because the six-week ban itself contains no exception for pregnancies resulting from rape, sexual assault, or incest, anyone *other* than the perpetrator could still sue a healthcare provider, abortion fund or family member who helps a patient end a pregnancy that resulted from the offense.

40.     S.B. 8 does not permit suits against abortion patients.  *Id.* § 171.206(b)(1).  But it provides a ready tool for abusive partners or family members who wish to thwart a patient's abortion.  Under S.B. 8, if such individuals know about a patient's plan to obtain an abortion, they can sue the patient's abortion provider, or anyone else who "intends" to assist with that abortion, to prevent the patient from accessing care.  *Id.* § 171.208(a)(1)-(3).

41.     S.B. 8 imposes draconian penalties.  Where an S.B. 8 claimant prevails, "the court shall award":  (1) "injunctive relief sufficient to prevent" future violations or conduct that aids or abets violations; (2) "statutory damages" to the claimant "in an amount of not less than $10,000 for each abortion" that was provided, aided, or abetted; and (3) the claimant's "costs and attorney's fees."  *Id.* § 171.208(b).  S.B. 8 does not require the claimant to allege or prove any injury to obtain an award.

(iv)    *The Rigged Nature of the Enforcement Proceedings*

42.    At every turn, the rules governing S.B. 8 enforcement proceedings sharply diverge from the rules that normally apply to Texas litigants in ways that make it impossible for those sued to fairly defend themselves.

43.    ***Statewide venue:*** S.B. 8 allows "any person"—including people with no connection to the abortion or patient, and those who are motivated by hostility to abortion rights or a desire for financial gain—to file lawsuits in their home counties and then veto transfer to a more appropriate venue.  As a result, those targeted by S.B. 8 lawsuits can be forced to defend themselves in multiple, simultaneous enforcement proceedings in courts across the State.  *See id.* § 171.210(a)(4) (permitting suit in the claimant's county of residence if "the claimant is a natural person residing in" Texas); *id.* § 171.210(b) (providing that an S.B. 8 "action may not be transferred to a different venue without the written consent of all parties").  In contrast, venue in Texas is generally limited to where the events giving rise to a claim took place or where the defendant resides, *see* Tex. Civ. Prac. & Rem. Code § 15.002(a), and a Texas state court may generally transfer venue "[f]or the convenience of the parties and witnesses and in the interest of justice," *id.* § 15.002(b).

44.    ***One-way fee-shifting in favor of S.B. 8 claimants:*** S.B. 8 provides that, in enforcement proceedings, anyone who brings an S.B. 8 claim and prevails is entitled to recover costs and attorney's fees.  Tex. Health & Safety Code § 171.208(b)(3).  Meanwhile, those sued under S.B. 8 cannot be awarded costs or attorney's fees if they prevail, regardless of how many times they are sued or in how many venues.  *Id.* § 171.208(i).

45.    ***Elimination of defenses:*** S.B. 8 purports to bar people who are sued from raising seven defenses under the statute, including that they believed that S.B. 8 was unconstitutional; that

14

they relied on a court decision, later overruled, that was in place at the time of the acts underlying the suit; or that the patient consented to the abortion.  *Id.* § 171.208(e)(2), (3), (6).  S.B. 8 also states that people who are sued may not rely on any "state or federal court decision that is not binding on the court in which the action" was brought.  *Id*. § 171.208(e)(4), (5).  The clear import of these provisions is to undermine the supremacy of federal law, force supporters of abortion patients to defend themselves over and over again, and hamstring that defense.

46.     The rigged nature of S.B. 8 enforcement proceedings sharply curtails Plaintiffs' ability to vindicate their federal constitutional rights in state court.

**B.     Section 4 of S.B. 8:  The Fee-Shifting Provision Applicable to All Lawsuits Challenging the Validity of Texas Abortion Restrictions**

47.     Section 4 of S.B. 8 creates an unprecedented one-way fee-shifting provision designed to deter all legal challenges to Texas abortion restrictions and penalize anyone who tries to bring such a challenge.  This provision applies to any person—including a party's lawyers— who seeks injunctive or declaratory relief to prevent enforcement of S.B. 8 or any other "law that regulates or restricts abortion," or any law that excludes those who "perform or promote" abortion from participating in a public funding program.  Tex. Civ. Prac. & Rem. Code § 30.022(a).

48.     This fee provision purports to apply in state and federal court, and to any state or federal claim, including Section 1983 claims brought to vindicate federal constitutional rights.

49.     Under this provision, civil-rights plaintiffs and their attorneys can be forced to pay defendants' attorney's fees unless they prevail on all of their claims.  If a court dismisses a claim brought by the civil-rights plaintiff, regardless of the reason, or enters judgment in the other party's favor on that claim, the party defending the abortion restriction is deemed to have "prevail[ed]." *Id.* § 30.022(b)(1)-(2).  That is presumably true even if the court ultimately enjoins the challenged

abortion restriction in full after, for example, rejecting one claim pleaded in the alternative or dismissing another rendered moot by circumstance.

50.     According to Section 4 of S.B. 8, the party seeking fees need not even have asked for them in the underlying litigation.  Rather, that party can file a new lawsuit against the plaintiffs and/or their attorneys at any time within three years of the claim resolution.  Further, the party seeking fees can choose to litigate their application in a new venue before a judge who did not preside over the initial case.  *Id.* § 30.022(c), (d)(1)-(2).

51.     State courts resolving such fee applications are directed to start from scratch. According to S.B. 8, they may not consider whether the court in the underlying case already denied fees to the party defending the abortion restriction, or already considered the application of S.B. 8 Section 4 and held it "invalid, unconstitutional, or preempted by federal law."  *Id.* § 30.022(d)(3). Nor does S.B. 8 explicitly limit fees to what is reasonable, unlike other fee-shifting statutes such as 42 U.S.C. § 1988.

## III.     THE CRIMINAL ABORTION BAN

52.     Section 2 of S.B. 8 includes a legislative finding that Texas has "never repealed, either expressly or by implication, the state statutes enacted before the ruling in *Roe v. Wade*, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother's life is in danger." S.B. 8 § 2 (Tex. 2021).

53.     The Criminal Abortion Ban made it a crime to "procure an abortion" at any stage of pregnancy.  *See Roe*, 410 U.S. at 117 n.1.  It further provided that: "Whoever furnishes the means for procuring an abortion knowing the purpose intended is guilty as an accomplice."  *Id.* Its only exception was for an abortion "procured or attempted by medical advice for the purpose of saving the life of the mother."  *Id.*  Violations of the ban were punishable by imprisonment. *Id.*

54.     In *Roe*, the U.S. Supreme Court affirmed a declaratory judgment that the Criminal Abortion Ban is unconstitutional and held that no further relief was necessary because the Court "assume[ed] the Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional." 410 U.S. at 166.

## IV.     IMPACT OF THE SIX-WEEK BAN ON PATIENTS SEEKING ABORTION CARE

55.     Persistent and formidable barriers prevent many people from obtaining abortions before six weeks of pregnancy.  These barriers include limited financial resources; systemic racism; later recognition of pregnancy; logistical factors such as difficulty taking time off from work or school, caregiving responsibilities, and lack of access to reliable and affordable transportation; and restrictive state laws.  Clients of abortion funds typically experience multiple barriers simultaneously, and their impact is cumulative.  People with low incomes, people of color, immigrants, and adolescents who lack parental support are disproportionately impacted by these barriers and are therefore more likely than others to experience delay in abortion access despite acting with urgency to obtain abortion care.  For many of these individuals, there is no practical difference between banning abortion at six weeks LMP and banning abortion altogether.

56.     Having limited financial resources is a major barrier to abortion access.  For people with little disposable income, it often takes time to save or raise enough money to pay for an abortion.[16]  The cost of abortion care increases as pregnancy progresses, however.[17]  Consequently,

---

[16] Ushma D. Upadhyay et al., *Denial of Abortion Because of Provider Gestational Age Limits in the United States*, 104 Am. J. Pub. Health 1687, 1692 (2014).

[17] Sarah C.M. Roberts et al., *Out-of-Pocket Costs and Insurance Coverage for Abortion in the United States*, 24 Women's Health Issues e211, e214 (2014).

the longer it takes someone to secure the money to pay for an abortion, the more the procedure will cost, which can trap an abortion patient in a cycle of fundraising and delay.[18]

57.     Although abortion funds provide financial assistance to abortion patients, they are generally able to cover only a fraction of the cost of abortion care.  One study of data collected from thirty abortion facilities throughout the United States, which took into account financial assistance provided by abortion funds, found that, for more than half of the patients involved in the study, the total out-of-pocket costs (including both abortion and travel), exceeded one-third of a patient's monthly income.[19]  Not surprisingly, 54% of the sample reported that the need to raise money to pay for the abortion and related expenses delayed them from obtaining care, consistent with other research findings.[20]

58.     Systemic racism is another barrier to abortion access that delays people from obtaining care.[21]  Systemic  racism has contributed to severe and pervasive disparities in reproductive healthcare access and outcomes among racial and ethnic groups, including higher rates of unintended pregnancy; preterm birth; maternal mortality; and breast, cervical, and

---

[18] Diana Greene Foster & Katrina Kimport, *Who Seeks Abortions at or After 20 Weeks?*, 45 Persp. on Sexual & Reprod. Health 210, 214 (2013) ("For some women, raising money for the procedure took so long that by the time they had gathered enough money, their pregnancy had progressed to a stage that necessitated a more expensive procedure.").

[19] Roberts et al*., supra* note 17, at e214.

[20] *Id.* at e215; *accord* Upadhyay et al., *supra* note 16, at 1692 ("In this study, one of the primary reasons for delay in seeking an abortion was time spent raising the funds to pay for the procedure and travel."); Jessica W. Kiley et al., *Delays in request for pregnancy termination: comparison of patients in the first and second trimesters*, 81 Contraception 446, 449 (2010) ("Our findings demonstrate that many women experience substantial difficulty obtaining money to pay for their procedures, and this problem was more common among the second-trimester respondents."); Lawrence B. Finer et al., *Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States*, 74 Contraception 334, 341-42 (2006) ("[S]econd-trimester patients were significantly more likely to indicate that they were delayed because they needed time to raise money for the abortion.").

[21] *See* Terri-ann Monique Thompson et al., *Racism Runs Through It: Examining the Sexual and Reproductive Health Experience of Black Women in the South*, 41 Health Affairs 195, 198 (2022).

endometrial cancer deaths among Black individuals.[22]  A growing body of literature documenting these impacts has led leading professional organizations in the field of obstetrics and gynecology to acknowledge that "[d]ifferences in outcomes result from many factors, including racism and bias in access to and delivery of quality health care, and must be acknowledged and addressed."[23] Systemic racism contributes to delays in abortion access for people of color, particularly those who are Black.[24]  Nationwide, more than 60% of abortion patients are people of color, including 28% who are Black.[25]  Relative to white individuals, Black individuals are significantly more likely to obtain an abortion in the second trimester of pregnancy.[26]

59.    Later recognition of pregnancy is also a major barrier to obtaining abortion care before six weeks LMP.[27]  Many people do not realize that they are pregnant until they are more than six weeks along.  Several factors may contribute to later recognition of pregnancy, including lack of sex education; low health literacy; lack of access to routine healthcare; and physical factors, such as lack of pregnancy-related symptoms, irregular menstrual cycles, use of hormonal

---

[22] Am. Coll. of Obstetricians & Gynecologists, *Racial and Ethnic Disparities in Obstetrics and Gynecology*, 126 Obstetrics & Gynecology e130, e131 tbl.1 (2015).

[23] Am. Ass'n of Gynecologic Laparoscopists et al., Joint Statement: Obstetrics and Gynecology: Collective Action Addressing Racism (Aug. 27, 2020), https://www.acog.org/news/news-articles/2020/08/joint-statement-obstetrics-and-gynecology-collective-action-addressing-racism.

[24] Christine Dehlendorf et al., *Disparities in Abortion Rates: A Public Health Approach*, 103 Am. J. Pub. Health 1772, 1776 (2013).

[25] Jerman et al., *supra* note 14, at 5.

[26] Rachel K. Jones & Jenna Jerman, *Characteristics and Circumstances of U.S. Women Who Obtain Very Early and Second-Trimester Abortions*, PLoS ONE, Jan. 25, 2017, at 9, 12, https://doi.org/10.1371/journal.pone.0169969.

[27] Diana Greene Foster et al., *Timing of Pregnancy Discovery Among Women Seeking Abortion*, 104 Contraception, 642, 642 (2021); Jones & Jerman, *supra* note 26, at 11; Foster & Kimport, *supra* note 18, at 212, 213; Finer et al., *supra* note 20, at 338, 343.

contraceptives, and above- or below-average weight.[28]  Adolescents are particularly likely to be delayed in recognizing that they are pregnant.[29]

60.     In addition, logistical factors are a significant source of delay in accessing care for many abortion patients.  A study examining causes of delay among people who have abortions at twenty weeks' gestation or later found that, "[o]nce participants decided to have an abortion, logistics often complicated their ability to obtain the procedure."[30]  Relevant logistical factors include difficulty taking time off from work or school, caregiving responsibilities, and lack of access to reliable and affordable transportation.[31]

61.     Texas' restrictive abortion laws further delay many patients' access to care.  For example, all patients living within one hundred miles of an abortion clinic must travel there for an ultrasound examination at least twenty-four hours before their abortion, Tex. Health & Safety Code §§ 171.011-.016, and patients less than eighteen years old must obtain written parental consent or a court order authorizing their abortion, Tex. Fam. Code §§ 33.001-.014.  Moreover, Texas generally bars coverage of abortion through its Medicaid program, 1 Tex. Admin. Code § 354.1167, health plans offered in the State health-insurance exchange, Tex. Ins. Code § 1696.002, and private insurance plans, *id.* § 1218.001-.006, compounding the financial hurdles patients face in attempting to access abortion services.

---

[28] Foster et al., *supra* note 27, at 643-45; Foster & Kimport, *supra* note 18, at 214; Finer et al., *supra* note 20, at 343; Eleanor A. Drey et al., *Risk Factors Associated with Presenting for Abortion in the Second Trimester*, 107 Obstetrics & Gynecology 128, 134 (2006).

[29] Finer et al., *supra* note 20, at 338, 343.

[30] Foster & *Kimport*, *supra* note 18, at 214.

[31] Upadhyay et al., *supra* note 16, at 1689; Kiley et al., *supra* note 20, at 449; Finer et. al, *supra* note 20, at 335, 341-42.

62.     Given these realities, it is not surprising that abortions in Texas dropped by nearly 60% after the six-week ban took effect, according to data published by the Texas Health and Human Services Commission.[32]

63.     A substantial number of people unable to obtain abortions in Texas before six weeks LMP lack the resources or mobility to travel out of state.[33]  As a result, they are suffering the physical and psychological impact of unwanted pregnancy and giving birth against their will or attempting to end their pregnancies without access to licensed healthcare providers.

64.     Even for someone who is otherwise healthy and has an uncomplicated pregnancy, pregnancy and childbirth pose serious medical risks with both short- and long-term consequences for the patient's physical and psychological health.  For someone with a medical condition caused or exacerbated by pregnancy, these risks are even greater.

65.     Not only does being forced to continue a pregnancy jeopardize a person's health, it also undermines the stability and well-being of their family, including existing children.

66.     For people experiencing intimate partner violence, forced pregnancy also exacerbates the risk of violence and further tethers the pregnant person to their abuser.

67.     In addition, forced pregnancy compounds the anguish of patients and their families who receive fetal diagnoses that are incompatible with sustained life after birth—requiring patients to carry nonviable pregnancies for months and suffer the physical and psychological burdens and risks of pregnancy, labor, and delivery, knowing all the while that their child will not survive.

---

[32] Associated Press, *Abortions in Texas fell 60 percent in month after restrictive new law*, NBC News (Feb. 10, 2022, 3:53 PM EST), https://www.nbcnews.com/politics/politics-news/abortions-texas-fell-60-perfect-month-after-restrictive-new-law-n1288948.

[33] *See* Kari White et al., *Research Brief: Texas Senate Bill 8: Medical and Legal Implications*, Tex. Policy Evaluation Project (July 2021), http://sites.utexas.edu/txpep/files/2021/07/TxPEP-research-brief-senate-bill-8.pdf.

68.     Many Texans who are able to travel out of state for abortion care are significantly delayed in obtaining abortions by having to gather the resources and make the arrangements required for out-of-state travel.  Because the vast majority of abortion patients are poor or have low incomes, they often have to forgo basic needs for themselves and their families to save enough money.

69.     Moreover, abortion clinics in neighboring states are overwhelmed with the influx of Texans making appointments there.  Patients seeking appointments at these clinics are having to wait several weeks as the clinics struggle to provide this time-sensitive care.[34]  Those who cannot wait must travel even farther distances.  Some Texas patients have traveled over 1,000 miles—each way—to obtain abortion care on the East or West Coast.

## IV.  DEFENDANTS' THREATS OF CIVIL LAWSUITS AND CRIMINAL PROSECUTION

70.     On September 22, 2021, Defendant Sharp moved to intervene in a challenge to S.B. 8 pending in this district "to defend and preserve [her] state-law right to sue abortion funds that pay for post-heartbeat abortions in violation of Senate Bill 8." Sharp Decl. ¶ 12, *United States v. Texas*, No. 1:21-cv-00796-RP, Dkt. 28-1; *see* Mot. to Intervene at 3, *United States v. Texas*, No. 1:21-cv-00796-RP, 2021 WL 4593319 (W.D. Tex. Sept. 22, 2021), Dkt. 28. In support of her motion, she declared under penalty of perjury that she "intend[s] to sue . . . abortion funds who pay for other people's abortions in violation of Senate Bill 8." Sharp Decl. ¶ 9, *United States v.*

---

[34] *See* Caroline Kitchener, *Texas patients are rushing to get abortions before the state's six-week limit. Clinics are struggling to keep up.*, Wash. Post (Feb. 14, 2022, 5:00 AM EST), https://www.washingtonpost.com/politics/2022/02/14/texas-abortion-sb8/ ("Texas patients who can afford to travel out of state will also face delays.  Schedules are backed up in Oklahoma, New Mexico, Louisiana and Colorado, as clinics struggle to absorb the surge of patients traveling from Texas.").

*Texas*, No. 1:21-cv-00796-RP, Dkt. 28-1. The Court granted Ms. Sharp's motion to intervene on September 28, 2021.  Order, *United States v. Texas*, No. 1:21-cv-00796-RP, Dkt. 40.

71.    In February 2022, Defendants Weldon and Maxwell respectively filed in state court verified petitions to take depositions and investigate a lawsuit ("Rule 202 Petitions") against two Texas abortion funds—Lilith Fund for Reproductive Equity and North Texas Equal Access Fund. Redacted copies of the Rule 202 Petitions are attached hereto as Exhibits 2 and 3. These petitions assert that Defendants' "goal is to . . . ascertain the identity of all individuals and organizations who are subject to liability under [Texas Health & Safety Code] section 171.208." Ex. 2 at 3; Ex. 3 at 3.

72.    On February 14, 2022, Defendants Weldon and Maxwell issued a press release through their lawyers stating that they filed the Rule 202 Petitions "to determine which individuals are subject to civil liability and criminal prosecution for paying [for] illegal abortions, which will include employees, volunteers, and donors" of the respondent abortion funds.[35] On February 21, 2022, Defendants Weldon and Maxwell issued another press release through their lawyers stating that the respondent abortion funds "exposed their employees, volunteers, and donors to civil lawsuits and potential criminal prosecution."[36] That same day, in response to a tweet by one of the abortion funds announcing its goal to "raise $20k for Texans who need abortions," Defendants'

---

[35] *AFL Files Petitions Against Two Abortion Funds in Texas Who Violated the Texas Heartbeat Act*, America First Legal (Feb. 14, 2022), https://www.aflegal.org/news/afl-files-petitions-against-two-abortion-funds-in-texas-who-violated-the-texas-heartbeat-act; *see also* America First Legal (@America1stLegal), Twitter (Feb. 14, 2022, 2:18 PM), https://twitter.com/America1stLegal/status/1493349001386770433?cxt=HHwWgoC-labAuLkpAAAA.

[36] *Abortion Funds to Face Pre-Suit Discovery over Violations of the Texas Heartbeat Act*, Thomas More Society (Feb. 21, 2022, 9:00 PM), https://thomasmoresociety.org/abortion-funds-to-face-pre-suit-discovery-over-violations-of-the-texas-heartbeat-act/.

lawyers tweeted a warning to potential "donors" that they "could get sued under S.B. 8."[37] A copy

of this exchange is attached hereto as Exhibit 4. Two days later, on February 23, 2022, Defendants'

lawyers tweeted that "[i]t is illegal to donate to abortion funds that pay for abortions performed in

Texas. Violators are subject to civil lawsuits and criminal prosecution."[38]  A copy of this statement

is attached hereto as Exhibit 5.

73.     On March 18, 2022, Defendant Cain issued a press release on his official letterhead

stating that he "sent cease-and-desist letters to every abortion fund in Texas, reminding them that

Texas law imposes felony criminal liability on any person who 'furnishes the means for procuring

an abortion knowing the purpose intended.'"[39] The press release further stated that Representative

"Cain warned that the employees, volunteers, and donors of abortion funds will be criminally

prosecuted if they do not immediately halt their illegal acts and stop paying for abortions

performed in Texas."[40]  A copy of this press release is attached hereto as Exhibit 6.

74.     On March 29, 2022, Defendant Cain sent a letter to an attorney representing some

of the Texas abortion funds. The letter, which appears in Defendant Cain's Twitter feed, stated

that he sent the cease-and-desist letters in his official capacity as a Texas State Representative.[41]

It further stated that the U.S. Supreme Court lacks the authority to invalidate Texas laws that

violate the U.S. Constitution and that "article 4512.2 [of the Revised Civil Statutes] remains fully

---

[37]     Thomas   More   Society   (@ThomasMoreSoc),   Twitter   (Feb.   21,   2022,   4:45   PM),
https://twitter.com/ThomasMoreSoc/status/1495922599704121352.

[38]  Thomas  More  Society  (@ThomasMoreSoc),  Twitter  (Feb.  23,  2022,  4:20  PM),  https://twitter.com/
ThomasMoreSoc/status/1496641113305886725.

[39]  Press Release, State Representative Briscoe Cain Sends Cease-And-Desist Letters to Abortion Funds in
Texas (Mar. 18, 2022), https://twitter.com/BriscoeCain/status/1504891954475290624/photo/1.

[40] *Id.*

[41]  Letter from Briscoe Cain (Mar. 29, 2022), https://twitter.com/bradj_TX/status/1508919831860588549/
photo/1.

enforceable against abortion funds that pay for abortions in Texas, as well as their donors."[42] A copy of this letter is attached hereto as Exhibit 7.  On March 30, 2022, Defendant Cain tweeted the following directive: "Prosecute Texas Abortion Funds." A copy of this statement is attached hereto as Exhibit 8.

75.   Because of Defendants' threats concerning enforcement of S.B. 8 and the Criminal Abortion Ban against Texas abortion funds and their associates, Plaintiffs Sadler and Mehl intend to cease donating money to Texas abortion funds, including the Stigma Relief Fund, until the Court confirms that these laws are unenforceable because they violate the U.S. Constitution.

## CLAIMS FOR RELIEF

## <u>CLAIM I</u>
### (Due Process Clause)

76.   The allegations in paragraphs 1 through 75 above are incorporated as if fully set forth herein.

77.   By banning abortion at a pre-viability stage of pregnancy, Section 3 of S.B. 8 violates the Due Process Clause of the Fourteenth Amendment, which protects the right to pre-viability abortion access.

78.   By failing to provide adequate procedural safeguards to defendants in S.B. 8 enforcement actions and imposing excessive, mandatory penalties, Section 3 of S.B. 8 violates the right to procedural due process protected by the Due Process Clause of the Fourteenth Amendment.

---

[42] *Id.*

## CLAIM II
### (First Amendment)

79.     The allegations in paragraphs 1 through 75 are incorporated as if fully set forth herein.

80.     By threatening to chill abortion funds' relationships with their donors, employees, and volunteers, Section 3 of S.B. 8 violates the freedom of expressive association protected by the First Amendment.

81.     By subjecting Plaintiffs and their attorneys to liability based on the viewpoint they express in litigation, Section 4 of S.B. 8 violates the First Amendment.

## CLAIM III
### (Supremacy Clause)

82.     The allegations in paragraphs 1 through 75 above are incorporated as if fully set forth herein.

83.     With respect to claims brought under 42 U.S.C. § 1983, the fee-shifting scheme set forth in Section 4 of S.B. 8 is preempted by 42 U.S.C. § 1988.

84.     The Criminal Abortion Ban cannot be lawfully enforced because, in *Roe v. Wade*, 410 U.S. 113 (1973), the U.S. Supreme Court held that it was unconstitutional.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Enter a declaratory judgment that S.B. 8 is unconstitutional and preempted by federal law, and is therefore unenforceable;

B.      Enter a declaratory judgment that the Criminal Abortion Ban cannot be lawfully enforced because the U.S. Supreme Court held that it was unconstitutional.

C.      Award Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

D.      Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated:  April 19, 2022

Respectfully submitted,

*/s/ Stephanie Toti*
Stephanie Toti
New York Bar No. 4270807
Juanluis Rodriguez*
New York Bar No. 5543194
Sneha Shah*
New York Bar No. 5345491
LAWYERING PROJECT
41 Schermerhorn Street, No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
Fax: (646) 480-8622
stoti@lawyeringproject.org
prodriguez@lawyeringproject.org
sshah@lawyeringproject.org

Rupali Sharma*
Maine Bar No. 006192
LAWYERING PROJECT
113 Bonnybriar Road
South Portland, ME 04106
Phone: (908) 930-6645
Fax: (646) 480-8622
rsharma@lawyeringproject.org

Melissa C. Shube
District of Columbia Bar No. 241034
LAWYERING PROJECT
712 H Street NE, Suite 1616
Washington, DC 20002
Phone: (646) 480-8942
Fax: (646) 480-8622
mshube@lawyeringproject.org

Dorian Vandenberg-Rodes
Texas Bar No. 24088573
SHELLIST LAZARZ SLOBIN LLP
11 Greenway Plaza, Suite 1515
Houston, TX 77046
Phone: (713) 621-2277
Fax: (713) 621-0993
drodes@eeoc.net

Tanya Pellegrini*
LAWYERING PROJECT
California Bar No. 285186
584 Castro Street, No. 2062
San Francisco, CA 94114
Phone: (646) 480-8973
Fax: (646) 480-8622
tpellegrini@lawyeringproject.org

*Motion for admission pro hac vice forthcoming*

*Attorneys for Plaintiffs*